That will call the first case, United States of America v. Joseph Nagle, Mr. Kent. That request will be granted. The issue in this case with Joseph Nagle v. Kent is whether they had seen him before he moved. At times they had been outside with computers and computer circuits. Now just let me ask you, does Mr. Fink properly have a claim on the standing issue? I thought you said Mr. Nagle, the issue for Mr. Nagle and Mr. Fink. Yes, but didn't Mr. Fink plead guilty before the decision was made on the motion to suppress? I did not mean that. I'm sorry, I didn't mean to suggest that he would stand the case. Okay, I just wanted to clarify that fact. Thank you. Well, you know, I'm a lot more interested in the sentencing issue than I am in the standing issue, right? Well, we're going to have then the second set of arguments that are going to deal with this sentencing issue. Mr. Kent, keep your voice. As they look at it, they're employees of companies and businesses. They're challenging the search of business premises. And there's a quote that I have in the employee analysis cases. The quote is a little bit particular facts and observances. It's what I call a fact of the policy. It's determined that the employee had some particular factual relationship to the person who was searching the place of business. If we give him a reasonable expectation of privacy, does that measure of concern? For example, someone who does have a computer. What's that reasonable expectation of privacy based upon? Well, Judge, on this, you have to keep in mind, because the heart of our reason for the ruling was Justice Scalia's statement in the Jones case, the GPS tracking case in 2012. And as the court had said, the legacy of the court. The Fourth Amendment, the reasonable expectation of privacy, the case of searching the basement, has to have the source of the problem in itself. And the historic... Would those warrant searches or warrant less searches? I think it makes a difference. Because the question here is standing. Standing is a matter of... Well, standing is a bit of a misnomer in the Fourth Amendment, isn't it? When we talk about standing, we're usually talking about case or controversy, right? Well, this standing is a term used to refer to the reasonable expectation of privacy. And in this case, clearly, Schoolkill and CDS could have challenged the search, right? Clearly, they could have, but they were not. Why didn't they? They were not, because that's the criminal case. Have they filed some claim that the search was invalid? Have they filed a constitutional tort claim? I don't know, Judge Arnold. But the question... I mean, I guess the fundamental question I'm struggling with is why would an individual have the opportunity to take advantage of a Fourth Amendment claim in his capacity as an individual when he availed himself of the corporate form and all of the entitlements and benefits that come with limited liability of the corporate form? Judge Hartley, I call that the view that you would be disenfranchised, an individual who disenfranchises the Fourth Amendment rights just by virtue of the legal form on which he holds title to some thing that he owns. Let's say we were 100% shareholder. We own 100% of the shares. We're just elected for tax reasons here. We're just elected for tax reasons to hold ownership of this thing. Are you arguing some form of automatic standing for Mr. Nagel just because he was a 51% shareholder? No, sir. I'm arguing what Legis itself says, which is that virtually it's almost inevitable that the owner of the thing will have standing or have a reasonable expectation of privacy. How do you define owner? There is a 51.1% control of the shares. Is 40% enough? Well, Judge, the term that's used in, I think it's the latest, is control. So Nagel has standing to challenge this search, but Fink doesn't, even though Nagel only holds 2% more of the company than Fink. Fink is totally out of luck, but Nagel has a plenary argument here. Judge, I don't know where we go, but I'm going to have to go down to this case because Nagel is the majority shareholder. What case support do you have? I guess you've got the Ninth Circuit. That's about it, right? Well, even here, Judge, the point that you just said, I think, yes, the Gonzales case is in our favor here. I think our passion plays for the Gonzales. I guess we have a future here. But I think we need both of those cases to analyze this problem in our mind. Yeah, but even in Gonzales, which you cite, then you think Gonzales and the Ninth Circuit is in your favor. In that case, the shareholders individually owned the premises that was searched. In this case, the premises that was searched was owned either by the corporation or one of the buildings that was searched. I think it may have been owned by Mr. Fink, but none of the buildings were owned by Mr. Nagel. So Gonzales really doesn't help you. Judge, I think the look at the form and title is just one way to conceptualize it. There's nothing that the government or the judiciary or the common law of the time has adopted to suggest that form and title were controlled with the right of the person to be protected in their persons, places. Should we look to who used the computers? No, no, no. And so if they accepted these standards of use of computers, in this particular exception cases, they're cited in great historic exceptions, because I think the presumption is it's more of an automatic standard than it is a presumption. If you're the owner of the thing, you have a reasonable expectation of privacy. You're a doctor, you're in the best place at the time, but you're not going to use your cell phone, you're going to take it off, you answer your question, you're going to use it, and somehow your abuse would take away from your claim your reasonable expectation of privacy. You could say that you won't use publicly, you're not going to publicize it. Well, if other people use a computer, if other employees use a computer and you don't. Well, other people might say you're the owner of your home, your wife and children might use your home, too. That doesn't cause you, it's in the nature of the thing. Yes, I can hear as long as you say it's in the nature of the thing. You're otherwise excluding the public, you're excluding the government, you're securing the servers from outside intrusion. And that's, that's the reasonable expectation of privacy. Here this company had 150 employees. 140. 140. Let's say employees, one through 20, were indicted. And each of those employees had his or her own computer terminal. Would they have standing to challenge the search? No. Generally, no. There you do have to look at the cases which examine the search based on the employees' particular rights and access to the things being searched. So even though it's their computer, their business computer, their password, they use it every day, they don't have standing, but Nagel, a guy who never used the computer, doesn't have the password, doesn't have access to that, he has standing. Well, first of all, I'm not distracting that reporter. An employee might as well have standing. Well, that's what I asked you. One through 20, they have standing to challenge their business computers. As to the computer, yes, yes. All right, and the flip side of that, why does Nagel have the right to challenge either Mr. Campbell's computer or Mr. Hubler's computer? It's his own computer. He owns them in his own name, or the companies own them? Yeah, I think it's, I call it automatic standing and upside down, if we're going to disenfranchise the citizen, because the arcane is the legal form of the title. That just to me, there's no right or wrong. No, this is more than just an arcane legal form of title. I mean, you're throwing out another legal concept when you start talking about the legal form of title. I mean, this is a corporate entity. Could Nagel have been paying taxes at the personal rate of 28%? Well, the effect that it did is the subject of the last check. I mean, you just pass through an amount of tax law, and the subject of the measure is passed through. And so, really, this is just purely fiction. It's just this legal fiction, and this whole title is the majority shareholder. But that's somehow disenfranchising. I would say this, as long as the patent's here, there's no significant precedent for that. In these cases, there's a valid side and a valid surface. The only one which has ever been decidedly approved by this court is 51 years ago. That's not so long. I mean, how far does this reasonable expectation of privacy go? You're basically saying because he's a 51% shareholder, he can, in essence, challenge the seizure and imaging of any employee's computer in that company. Isn't that what you're arguing? It's talking about his corporation, which he owned yesterday. That's automatic standing. You're disavowing automatic standing, but you're coming back and saying he's able to do it because it's his corporation. Unless he falls within one of the recognized exceptions, it's pretty hard to recognize, which would be, for example, regulatory search, administrative search, abandonment of those to the public, search outside of the typical jurisdiction aspect. Those are the exceptions the Supreme Court has recognized. None of them. I'm only arguing for the application of the President of the Supreme Court in South D.C. on the murder case in New York. It's well-established, it's long-standing, that a citizen has an expectation of privacy and commercial premises, just as in his home. The only exception the Supreme Court has made to that proposition, which is long-standing, is for regulatory search. All right, we'll have you back on your bow. Thank you. Ms. Ellickson? Thank you, Your Honor. May it please the Court, Jenny Ellickson of the United States, and with me at Council Table is Bruce Randler. The District Court properly denied Mr. Nagle's suppression motion because Mr. Nagle failed to carry his burden of establishing a legitimate privacy interest in any of the computers whose data he sought to suppress. As Mr. Nagle's argument here today demonstrates, he's relied principally and solely on his ownership of shares in the company at which he worked, but he had no personal connection at all to 11 of the 12 computers at issue, and the remaining computer was a shared company server to which two dozen employees had access. And as the District Court found, he had no... All right, why doesn't he have a reasonable expectation of privacy to the search of the server? Well, Your Honor, the server was... He actually referred to portions of the server as quote-unquote public. I think that's on page 276. But the record shows that only 24 people had access to the server. You're right, that's true, Your Honor. And he's one of the 24. He and Fink were two of the 24. Yes. No, that's true, Your Honor. It was not open to the general public, but Mr. Nagle presented no evidence that he personally took any steps to prevent it from being open to the public. The company just said... Well, but there were passwords. There were passwords. That was the company policy. Well, I mean, you can't say on one hand he took no steps and then acknowledged that there were passwords. It was password protected. That was a security measure that the corporation imposed on the server. Well, I mean, he may not get full benefit of everything because it's a corporate entity, but isn't there some credit at least to him as an officer for giving himself and Mr. Fink access and adopting password protection? It's not clear that he had anything to do with the decision to adopt password protection. He didn't introduce any facts on that front. But even acknowledging the fact that there was a password protection to the server generally, Mr. Nagle presented no evidence about specific documents that he stored on the server. He much less explained where those documents were located or identified any measures that he had taken to keep those documents private from other people who had access to the server. What the server is essentially is the equivalent of, say, an employee break room in a workplace. And there's a bulletin board on the employee break room and people have tapped flyers up to this bulletin board. And what Mr. Nagle is trying to do, essentially, is argue that he has a reasonable expectation of privacy in any case, and he's open for it. But he hasn't identified any steps that he took that indicate that he either actually expected things on the server to be private or that a reasonable person in his position would have thought they were. So it sounds like you're on board with a case-by-case analysis of whether an individual can assert a personal fourth amendment right in business property, rather than seeking a break line rule like the Second Circus decision in the Legout case that says there's this dichotomy between personal rights and business rights. Well, your Honor, I think that what the Supreme Court's case suggests is that this does have to be a case-by-case inquiry based on the facts of the case. But I think that... What are our guideposts? Is it 51% ownership versus 49? Is it 100%? Is it companies that have fewer than 50 employees or fewer than 200? I think that Mr. Nagle's status as a majority shareholder in this company is largely beside the point. When this Court's considering his legitimate expectation of privacy. The Supreme Court said in the Oliver case that the premise of the property's versus controlled right of the government to search and seize has been discredited. This is a case we said in memory. We didn't use this exact quote. But, I mean, generally, there are some older Supreme Court cases that suggest that property ownership is relevant. But the Supreme Court has really moved into this general standard that what you have to do is, on a case-by-case basis, demonstrate a legitimate privacy interest. I think, theoretically, someone who is a majority shareholder could demonstrate that privacy interest if, for example, they showed that they exerted control over the location to be searched, that they had a personal connection to the material seized. So his laptop here conceding, had it been seized, he would have standing on that? He would have had to carry his burden of proving that. But I think, based on the record, it's likely he would have been able to make a showing with respect to this. I don't want to concede that since he didn't have to do it. Okay, I'm not assuming that you conceded that. But extending that laptop, the next step, and we're talking, really, because the District Court made this determination on Fourth Amendment standing, why wouldn't he have standing to at least challenge the search of his e-mails? Well, Mr. Nagle, it's actually not clear from the record even where these e-mails were located. They were located on the server. There were some e-mails located on the server. He said that he wasn't sure where on the server they were, if they were in the public area of the server. And, in fact, some companies actually outsource their e-mails to off-site locations. So on this record, on the facts we have, it's just not totally clear. Theoretically, Mr. Nagle could have potentially adduced facts that could have satisfied a burden of showing that he had a biased interest. But I guess my concern is he didn't get to that. Was he given an opportunity to get to that point if the Court determined under these facts and the facts of the search and the warrant that was issued that he didn't have Fourth Amendment standing? Well, the District Court held an evidentiary hearing at which Mr. Nagle had the opportunity to present evidence in support of his standing. And, in fact, he attempted to do that. He testified in the hearing himself, and he also examined government agents who had examined his computers and attempted to ask questions of them about how their computers were configured. The agents had not looked at all the issues that Mr. Nagle, I think, had had, so they couldn't answer all of his questions on this point. But what Mr. Nagle could have done, since he did have the burden of demonstrating standing, is that he could have called his own witness. He had copies of his computers, and he could have called a witness to examine the computers and testify about how they were configured and how his email was somehow secured in a way on the server that made it somehow private to him, however he wanted to attempt to demonstrate that. But he didn't do that. On this record, all we know is, at best, that his emails were stored somewhere on the server. We know that portions of the server were, in Mr. Nagle's own words, public. And he testified that he did not know if his emails were on the public portions of the server or not. So he just did not care. So it's a failure of proof. At the end of the day, you're saying this is more of a failure of proof case than it is a case where we need to evaluate all the circumstances. Because there aren't that many circumstances, if I hear your argument. He didn't put them before the district judge. Yes, I think this court needs to make its determination based on the facts in front of it. And based on the facts in front of it, it doesn't tell you the circumstances of inquiry, but there just aren't enough facts for this court to conclude. You can see it in the case file. Well, there aren't many facts for us to look at as it relates to this particular question. But at the trial, at Mr. Nagle's trial, were any of his emails used to prove the government's case? That, I'm not sure. I have a better sense of that than I do, because he was a file count counsel. I don't recall any of his emails were used. But even if some of his emails were used, it doesn't follow necessarily that they came from his own email account. He was presumably emailing with other people in the company, and people who received his emails would have had copies as well. And so what Mr. Nagle would have to do is establish, in order to establish a right to even bring a suppression measure, I think he would have to show that these copies were in his email account, and that his email account was somehow private. But if the government obtained copies of his emails from other people in the company, Mr. Nagle wouldn't have standing to challenge that, because as soon as he sends the email to someone else, he can no longer expect that that email will remain private, that copy of the email. So this is just, Mr. Nagle, he could have produced these facts in the suppression hearing. He could have presented the district court with information about what files he had where, and how he protected them, and he just didn't provide the court with that kind of specific information. All right, I think even in the cases, the line of cases that you urge us to adopt, like Britt and SDI Future Health Inc., you acknowledge that a shareholder could show a reasonable expectation of privacy if there was a nexus between his particular workplace and the area that was searched. Yes, I think just as anyone else in the company could show a reasonable expectation of privacy that way, so that this whole shareholder could as well. And so that's why those cases do not disenfranchise shareholders, as the opposing counsel was suggesting during his argument. I think it just means that they're subject to the same rules as anyone else would be in a workplace, and they don't get a special privilege by virtue of their status as shareholders. And that's consistent with the Supreme Court's move away from looking at property ownership as being a dispositive factor for preventative analysis. So the impact of your rule would be more narrow than what opposing counsel has suggested. I mean, he's basically saying, well, no shareholder could ever establish a reasonable expectation of privacy if, in fact, all shareholders didn't have access. Right, and I think basically a shareholder would have to undergo the same analysis as any other person in the workplace. And if, like any other person in the workplace, he could show, for example, this came from my office, this came from, you know, a safe that I only have the accommodation to, in those circumstances, I can imagine a court properly concluding that that defendant carried his burden, that Mr. Nagle has not done that here. Do you agree with Mr. Kent that the reasonable expectation of privacy analysis applies in the same way to warrantless searches as it does to this search where there was a warrant? Well, I think the analysis of whether there was a reasonable expectation of privacy does end up sort of merging with the question of whether there was a search or an improper search. And so I think it does become a little bit complicated. But I think this Court could apply this new analysis to both types of cases. I do think the Supreme Court's analysis in the Jones decision was motivated. I think the Court there was not looking at really reasonable expectation of privacy so much as it was looking at the question of whether or not there was an improper, illegal search that would have required a warrant. Are you talking about the Supreme Court's Jones case? Yes. Well, they just said there's a trespass, that's all. Right. And that was a warrantless search. Exactly. But are there cases involving... I mean, this whole reasonable expectation of privacy comes out of Katz, right? Fourth Amendment protects people, not places. In Katz, was there a warrant in Katz? I think there was no warrant in Katz. I'm trying to think of cases where there were warrants where this reasonable expectation of privacy was malignant. I mean, it hasn't been malignant... For almost 200 years, it wasn't an issue. It's given birth in Katz, and then it's repeated after Katz. But in the cases I've seen, it's repeated in warrantless cases, not cases where there's a warrant. So are we sure it applies here? I do think, yes. I think definitely even a defendant in the case of a warrant, a search of a warrant, does have the burden of demonstrating that it was civil rights that were violated by the allegedly improper warrant. It's not that anybody, you know, on the premises, it is enabled, and it was not on the premises. But we still need to establish the reasonable expectation of privacy, even in the context of a warrant search. And we said that this year in U.S. v. Donahue, didn't we? Are you familiar with that case? I took the coursework for it. But I think there are cases like that, yes, that say it is a threshold requirement. I have to answer other questions that the Court may have about this issue or the other issues raised in the brief. I've seen it a long time, so I wanted to take a quick opportunity. Is Mr. Brandler going to cover the harmless error question on sentencing? Mr. Brandler is going to be covering the merits of the loss issue. With respect to Mr. Nagle's specific harmlessness argument, I'm prepared to discuss that. Okay. Could you comment on that? Yes, Your Honor. So Mr. Nagle's, to the extent that Mr. Brandler will be addressing the merits of the loss issue, but even if there were some error in the district court… To the extent we didn't agree with Mr. Brandler. Right. I'm not saying that we don't, but to the extent we did. Yes. Even if we didn't agree with Mr. Brandler, there was no error as to Mr. Nagle because the district court ultimately gave Mr. Nagle exactly what he wanted. After giving him initially the loss calculation that gave him a 24-level enhancement, the district court then departed downward 10 levels to give him a 14-level enhancement for loss, which is exactly what Mr. Nagle had actually asked for and what Mr. Nagle claims was, you know… He can only ask for a departure after he suffered the radical increase based on the high loss amount. So we don't know what would have happened had he not suffered the increase based on the loss calculation. Well, we do know what would have happened because in addition to doing the downward departure, the district court also gave him a variance and buried it down an additional three months below the bottom of his… But where did the district court make a plain statement that would indicate that the sentence would have been the same regardless of the sentencing? I mean, that's what we required in Zabielski, and I don't see that on this record. The district court did make it clear at sentencing that it would be considering a number of the three factors and in a statement of reason in support of the variance, it said, and the court concluded, that the sentence that it imposed was appropriate and that it was necessary to achieve the sentencing objectives. But that doesn't say anything about what the court would have done had the loss calculation been radically lower. Well… Because, I mean, the loss calculation informs the starting point, right? You'd agree with that. Yes. And if the starting point is here instead of here, we don't know where the district court would have ended up, right? Well, the district court ultimately lowered the loss calculation back down to what Mr. Nagel had originally asked for by doing it at some level of downward departure. And in the order, and I know Mr. Kansas, in his reply, we discussed the district court's order denying bail pending appeal. In that order, the district court actually said that Mr. Nagel had suffered no prejudice in the loss enhancement and that the court had determined, and based on the sentence, not on the guidelines, but based on its conclusion, that the appropriate term of imprisonment was 84 months. And so, again, this is not for the facts stated by the district court, but it does confirm the district court's reasoning. I see that I'm out of time, so unless the court has further questions, they are going to request a response. Okay, Ms. Ellickson. And Mr. Kent, we'll have you back on rebuttal. That's okay. Well, you came a long way. We'll allow you to get those few words in. You said you were going to rest on Mr. Fink's argument on sentencing, but he may not, the counsel for Mr. Fink, may not argue the harmless error question for you. And it might be a little bit different. Even if we disagree with Mr. Brantler on the loss calculation, is that error harmless, as referred to you? It's hourly, of course. If she had said that in sentencing, you might have a much higher mountain to climb, right? It was not a sentencing hearing. I've asked the court the rest of the case, and the decision of the court office, on my term, which is a broader hold, and there's a pardon on that one, but wherever we draw the line, we don't have to marry that pond which I'm actually in this case. A broader hold, I mean, is, I think it's important, clearly, it's not moving away from property rights and putting that on the termination, but moving further forward. Justice Scalia seems to be having a bad year, and Justice Scalia is curious. He said that in the property approach, it's the men who are the citizens of the country. Let me just agree with you on that. Certainly, when we read Jones, it's clear that property rights matter, but opposing counsel argued that there's a failure of proof here. If we analogize your argument to Jones, it would be like Jones doesn't just want a Fourth Amendment challenge on the car that he owns, that he's renting or driving, but he wants to assert a Fourth Amendment right on all of his co-workers, all of his employees' cars that are parked in the lot, and there's 139 of them, and he's going to say, well, I'm going to assert a right as to their vehicles and their computers and the server and the whole kit and caboodle. That's really what you're trying to get us to accept here. Everything the corporation owns, right. The corporations are people too, isn't it? And certainly, if we honor the corporation, which is just a legal fiction, if we honor it by subject to test, it's a legal fiction, then it cannot disenfranchise the citizen. All right, but that's that, I think to Judge Fischer's point, that's that automatic standing you're asking for. It doesn't seem that you've made a record here. Let me give you some counterfactuals. Mr. Nagle gets on the witness stand and says, I'm very involved in our IT program. I'm not only the owner of the company, but I manage it, and I meet weekly with our head of IT, and we change our passwords every week, and I have access, because I'm very concerned about what my employees do, I have access to all of their computers, and we monitor what they're doing to make sure that they're not using it inappropriately or that we don't get hacked, etc., etc. There are a whole series of facts that you might conjure that would show that Mr. Nagle had some real interest in all of his co-workers' computers, but this record appears to be devoid of any of that. I don't disagree. I don't think that that's the sort of analysis of the SBI Future Fund. That's sort of in the parts of dealing with, let's say, for homes. Let's say it's a wealthy individual, like, again, Governor Romney. He has homes all over the world. He may have a home in the south of France that he sees once every five years. Well, it's not this building downstairs. He has a home in Malibu that he sees once every five years. He's never there. He doesn't know who manages his home, who cleans it, who has the keys to the home, and he knows none of that. But if the governor came in with a search warrant, searched his home in Malibu, he would certainly have the right to challenge him. He sees the owner of that home. But he's not a corporation owning that home. He's an individual owning that home, and I think there's a difference. I think there is a difference. I do think the governor... Well, I'm a Delawarean. I think there's a lot of difference. Well, there's not really in terms of the fourth amendment right. What I mean is just as clearly said. What is the source of the content of that privacy right in the fourth amendment? This basically goes back to the property right. The property right preceded the adoption of the fourth amendment. The essence of your argument is a family-owned escort needs to be treated just like a person. The fourth amendment is a yes. You didn't make any subsidiary attempt to try to show that the server, that he had a more particularized right to privacy to the server or his e-mail, did you? That's correct. To answer your question, I believe his e-mail, some of the e-mails when they were used, they were used to show that he was highly conceiving of technology, highly conceiving of being involved. Now, yes, the government said some of these e-mails of course went back and forth. The government said that they were very important. They said the e-mail changes with these technology-considered underhand methods. They were very important. Well, Ms. Ellickson said you made no attempt to show that at the suppression hearing. Did you make an attempt? Did you object to the introduction of those e-mails at trial? Yes, I think all of the motions of press objection was preserved throughout the case. I'm going to answer your question about that. My point would be that just saying I gave an example of a private entity, five insider trading, much of this is information that can be shared by many people in that corporation. That doesn't take away from the expectation of privacy. In fact, the higher confidentiality of this information. Mr. Nagle did all that he could and yet he's a person. He doesn't have some kind of ID record to make sure that he knows that he's doing his job and makes sure he personally knows about it. Still, this information is public and government-run information. Thank you. Okay. All right, we thank you, Mr. Kent. And we thank both Mr. Kent and Ms. Ellickson for their presentations on this part of the case.